## Richmond.

### ELLIOTT'S ADM'R V. HOWELL AND ALS.

#### January 17th, 1884.

1. FIDUCIARIES—*Good faith—Ordinary prudence.*—Guardians and other fiduciaries are accountable only for the exercise of good faith and the same discretion that a man of ordinary prudence is accustomed to exercise in the management of his own affairs. *Myers* v. *Zetelle*, 21 Gratt. 733.

2. GUARDIANS—*Investment of funds.*—It is the duty of guardian to invest properly his wards' funds which come to his hands, and for his failure so to do he incurs liability according to the nature of the case.

3. IDEM—*Idem.*—Where guardian properly invests wards' funds in real estate, and mistakenly, through no bad faith of his, conveyance thereof is made to the wards' mother, and on discovery of the mistake, guardian procures her to convey the property to the wards by deed to be held *in escrow*, until wards' maturity, so as to give them option then to accept the conveyance, or to reject it and leave the property in the mother, and by accident the deed of conveyance is destroyed, and after her death the property is sold without objection on the wards' part, to pay her debts, guardian be should not held accountable.

Appeal of Thomas Tabb, administrator of George W. Elliott, deceased, from decree of circuit court of Elizabeth City county, pronounced in April, 1879, in chancery suit of M. B. Howell and als. against appellant and als. Intestate, as guardian of the children of his deceased brother, Bailey T. Elliott, received $750 belonging to his wards and invested the money in a house and lot in the town of Hampton as a home for the children and their mother. By some mistake the conveyance was made to the mother. The mistake being discovered in 1858 the

guardian procured from her a conveyance of the property to the children, to be held *in escrow* until they came of age, when if they assented, it should be returned to her and the property remain as it was. No claim was made on guardian during his life. The house was destroyed at the burning of the town of Hampton during the war in 1861. The *escrow* had been placed in a safe in that town and was destroyed. After the mother's decease the children suffered the lot to be sold to pay their mother's debts, but received as her heirs property of greater value than the lot. After guardian's death they instituted said suit to hold his estate responsible for the $750 and its interest. The circuit court decreed in their favor. From the decree the administrator appealed to this court.

Opinion states the remaining facts.

*L. R. Page* and *G. M. Peck*, for the appellant.

*M. B. Seawell* and *John Howard*, for the appellees.

1. The plain duty of the guardian was to invest the proceeds of the real estate of his wards in other real estate in their names, or ear marked for their use and benefit in such manner as that the investment should be identified as their own, and be clearly secured to them. Perry on Trusts, § 452.

2. The purchase of property in the name of another person, and payment of the purchase money with this fiduciary fund, was a palpable breach of trust, and misappropriation of the fund, and the trust fund having been thereby lost, the guardian and his estate became clearly liable for the loss. Perry on Trusts, § 847; Code of 1873, ch. 128, § 7, and ch. 124, § 8; 1 R. C. 409, § 20; ch. 123, §§ 8 and 13; 1 Min. Ins. 442–449; *Rinker* v. *Steil*, 33 Gratt. 663.

3. The assignments of error on page 2 of the petition for appeal afford no answer in exoneration of this liability.

4. The principles referred to, and the cases cited—*Knight* v. *Lord Plymouth,* 3 Atk. R. 480; *Thompson* v. *Brown,* 4 John. Ch. R. 619; *Hart* v. *Ten Eyck,* 2 Ib. 62; *Wilkinson* v. *Stafford,* 1 Ves. IV R. 32; *Elliott* v. *Carter,* 9 Gratt. 558–9; and *Myers* v. *Zetelle,* 21 Gratt. 758—have, it is submitted, no application to this case. Good faith in doing what is plainly illegal and wrong, is no defence against the consequences of the wrong. No amount of good intentions can exempt a trustee from responsibility for voluntarily placing trust funds in his hands beyond his control, by investing them in the name of another, so that they can lawfully become subject to the debts of that other, and be lost to the beneficiaries. Nor were the beneficiaries, if able and so disposed, bound to follow the fund *into* litigation, but are at once entitled to look to their trustee to make good the loss.

This is a controversy in substance between the heirs at-law or next of kin of the guardian, who died childless. He was kind and generous to all of them alike. Each is entitled to stand upon his legal rights in respect to his estate, and no blame can be attached to any for asserting those rights.

RICHARDSON, J., delivered the opinion of the court.

This is an appeal from a decree of the circuit court of Elizabeth City county, pronounced at the April term thereof, 1879.

The facts, so far as necessary to be stated, are these: Bailey T. Elliott, late of York county, departed this life about the year 1844, intestate, leaving, surviving him, a widow, Susan, and three children, namely: Isabella, George B., and John Elliott. All of these children were, at the time of their father's death, infants, aged, respectively, six, four, and two years.

The estate of the decedent consisted of a tract of land, in York county, of comparatively small value, four negroes —one of them old and infirm and of but little value—and a small amount of personal property, the latter being inadequate to the discharge of the decedent's debts without a sale of the slaves. In January, 1845, George W. Elliott, a brother of said Bailey T. Elliott, duly qualified as the administrator of the personal estate of said decedent, in the county court of York, and, also, by the appointment of the same court, became the guardian of the said infants.

In the year 1851 an account of said George W. Elliott, as administrator of said Bailey T. Elliott, was returned to the county court of said county, which purports to have been settled on the 31st day of December, 1846, by which it appears that the estate was then indebted to the administrator in the sum of $480.88. The record does not disclose any other settlement of his transactions by said George W. Elliott, either as administrator or guardian.

Not very long after his qualification as guardian of his said wards, Geo. W. Elliott, as such guardian, instituted suit, and proper proceedings were had, in the circuit court of York county, for the purpose of having said land, of which the said Bailey T. Elliott died seized, sold; and on the 28th day of September, 1847, in obedience to a decree of said court, made in said suit, the same was sold for the sum of $1,030.00, and, after deducting expenses and the interest therein belonging to said widow, the residue, $750, belonging to said infants, was invested in a house and lot in the town of Hampton, and this house and lot became the home of said widow and her children, the said wards, and where the latter were sheltered from their tender infancy until they attained nearly, if not quite, their years of maturity ; when, in 1861, the house was destroyed by fire, at the burning of said town of Hampton. This proceeding for the sale of the said land and the investment made, was at the in-

stance of said widow, who desired to move to, and live in, the town of Hampton, on account of the superior advantages afforded by that town for the education of her children. To further this laudable design, G. W. Elliott, administrator and guardian, as aforesaid, co-operated with her, (the said widow of the decedent), and her purpose was effected.

Bailey T. Elliott, at the time of his death, owed his brother, the said George W. Elliott, a considerable debt, evidenced by bond. The slaves owned by decedent were hired out, and the widow collected the hires, which did not exceed $400 per year, and appropriated them to the support of herself and said three children, so that no part thereof ever came to the hands of said administrator and guardian. Some ten years after the death of Bailey T. Elliott, on account of some bad conduct, one of said slaves was sold for the sum of $800, and the proceeds applied by said administrator to his said debt against the estate of his dead brother, the amount being insufficient by a few dollars to discharge the same with the interest then accrued thereon. Aside from the sale of this negro, and the interest of said children in the proceeds of said land sale, no part of the estate of the decedent—nothing belonging to his said wards—ever came to the hands of said George W. Elliott, either as administrator or guardian. For the support of herself and children, said widow had nothing but the small sum she derived from the sale of her husband's land and the hires of said slaves; and these could afford but a meagre support for the family. In this state of circumstances, said George W. Elliott, administrator and guardian, who was connected with the naval service of the United States, was then unmarried, and a man of considerable means, with a most commendable, open-handed generosity stood nobly in the relation of a parent and kind benefactor to these wards, not for gain,

but that he might, as he did, do for them far more than their father could have done had he been living. He refrained from pushing to collection the large debt he held against his dead brother. He permitted the widow to collect the hires of the negroes, and use them, so far as they would go, in supporting herself and family; and these were largely inadequate to their support and the education of the children. He educated Isabella at the Chowan Institute in North Carolina, and at the Richmond Female Institute. George B. he educated at the Hampton Academy and at the University of Virginia; and John, after leaving the Hampton Academy, having an inclination in that direction, was sent to Philadelphia, where he was given the best advantages afforded by that city for learning the trade of a machinist. All this was done at his own expense by George W. Elliott, their uncle and guardian.

But by some mistake (it does not precisely appear how it occurred) the house and lot in Hampton was conveyed to Mrs. Susan Elliott, the widow of said Bailey T. Elliott, and mother of said wards, instead of being conveyed to them. Some time before the war, and when George W. Elliott was about going to sea, being advised that said house and lot was improperly conveyed, and apprehensive that trouble might grow out of the mistake thus made, he, through his attorney and agent, procured a deed to be made by Mrs. Susan Elliott in favor of her children as to said house and lot; which deed was duly executed and delivered to said agent as an *escrow* to be held until the children became of age, when at their choice they could take and hold their property thereunder, or release it to their said mother. This deed was by said attorney and agent placed for safe keeping in an iron safe in his law office in the town of Hampton, and was destroyed by fire at the burning of that town early in the war.

At this time, in fact from soon after the time when Mrs. Susan Elliott made said deed until the close of the war, George W. Elliott was, in his official character, with the navy of the United States on the northern lakes. His ward, Isabella, having graduated at Richmond Female Institute, had married Mr. Howell and gone with him to their home at Nashville, Tennessee, where she, after giving birth to several children, died. George B., another of said wards, having left the University of Virginia, also settled in Nashville, where he has been prosperous. And John, the other of said wards, died in infancy, unmarried and childless. Said guardian, George W. Elliott, married late in life, and a few years after the war died intestate, leaving a widow, but no children; and at his death was the owner of real and personal estate of very considerable value, which descended to his heirs at law, including the appellee, George B. Elliott, and the children of said Isabella Howell, deceased; and the appellant, Thomas Tabb, became the duly qualified administrator of said George W. Elliott, and, as shown by the record, has faithfully administered upon the estate of his decedent.

Since the war, at the suit of the creditors of Mrs. Susan Elliott, the lot in Hampton was sold and the proceeds applied to the claims of said creditors, the appellees interposing no objection and asserting no claim to said lot of land. In the meanwhile said widow had acquired other property in said county in her own right fully equal in value with said lot, which passed at her death to her said children and grandchildren, and which might have been subjected to the demands of said creditors, but was not, as the sale of said lot was sufficient; so that in point of fact no loss was sustained by the children and grandchildren of Bailey T. Elliott, to whom said lot really belonged.

Such being the facts, Morton B. Howell, who was the husband of said Isabella, and George B. Elliott, the only

surviving son of Bailey T. Elliott, the appellees, filed their bill in the circuit court of Elizabeth City county against the said Thomas Tabb, administrator of said George W. Elliott and his heirs at law and next of kin, who were numerous; and others, setting forth substantially the facts, charging that the money invested in said Hampton house and lot by said guardian, George W. Elliott, had been lost to them by his negligence, resulting in the improper conveyance of same to said widow instead of her said children, and the consequent subjection thereof to the claims of her creditors; and asserting a preferred claim against the estate of said George W. Elliott for the amount so invested; charging that the accounts settled by said Thomas Tabb, as administrator of George W. Elliott, were erroneous and should be corrected; and further charging liability upon said estate for the sum of $800, the proceeds o the sale of the slave Sally, received by said George W. Elliott, guardian and administrator. And the real estate of said George W. Elliott having been sold and the proceeds distributed among those entitled thereto, the bill further charges liability upon said distributees for the claims asserted therein against said George W. Elliott, and asks for a settlement of his accounts and the ascertainment of the extent of his liability, both as administrator and guardian, and a decree accordingly.

The said Thomas Tabb, administrator of Geo. W. Elliott, answered the bill, stating the fatherly care and protection extended by said guardian to his said wards in their sustenance and education at his own expense, amounting to several times as much as their entire patrimony; stating that by some mistake the house and lot in Hampton had been conveyed to Mrs. Elliott, the mother of said children; that subsequently, George W. Elliott had, by his agent and attorney, procured from Mrs. Elliott the deed protecting the rights of said children and wards, and the destruction

of said deed; stating the destruction by fire of the build-
ings on the lot in the town of Hampton, and the subsequent
sale of the lot to satisfy debts due by Mrs. Elliott; and
stating further that his decedent had never, as administra-
tor of Bailey T. Elliott, or as guardian of his said children,
appropriated to his own use even one dollar of said estate;
and denying any and all liability upon his decedent's estate
for the claim asserted by said bill.

The cause having been matured for hearing, on the 24th
day of April, 1875, an account was ordered to be taken of
the transactions of said George W. Elliott as guardian, and
requiring, in aid thereof, that Thomas Tabb, administrator
of said George W. Elliott, produce before the commissioner
taking the same, all books, papers and vouchers in his pos-
session or under his control, touching the matters thereof.
Accordingly the commissioner took and returned the ac-
count, in which the commissioner, taking as a basis the
settlement of his administration account by George W.
Elliott, before referred to, and charging said Elliott as
guardian with the actual receipt of the hires of the slaves,
the $800 received from the sale of the slave Sally, and
crediting him with the debt and interest accrued, due him
from the estate of the said decedent, Bailey T. Elliott, as
of the date of the sale of said slave, and with the expenses
incurred for clothing, board and tuition of his wards, ac-
cording to the then prevailing rates, as near as the same
could be ascertained; by which account each of said wards
appeared largely indebted to their guardian. This account
was taken by Commissioner S. W. Armstead, and no excep-
tions thereto appear in the record, nor is there any decree
adopting the settlement therein reported, nor recommitting
the same; but it must have been recommitted, as there is
in the record a further report by Commissioner John Booker,
purporting to have been made in obedience to a decree in
the cause, rendered on the 24th day of April, 1875, which

report bears date September 12th,. 1873. This is evidently a typographical confusion of dates, and the report was perhaps made in 1878, as the final decree in the cause was pronounced on the 28th day of April, 1879, and is founded on this report of Commissioner Booker. This report was excepted to, upon various grounds, by the administrator of George W. Elliott. The court, strangely enough, overruled all of said exceptions, yet rejected "Statement X" in said report, which had been excepted to, and confirmed the said report in all other respects, and entered a decree against the administrator of George W. Elliott for the sum of $750, that being the amount invested by said George W. Elliott as guardian in said house and lot in the town of Hampton, with interest thereon from the 1st day of June, 1865, but decreed the same in parcels to the several parties entitled thereto, to-wit: To George B. Elliott the sum of $250; to each of the infant defendants, Susan Howell, Morton B. Howell and Alfred Howell, children of Isabella Howell, who was, before her marriage, Isabella Elliott, or to their guardian, the sum of $83.33½, the plaintiff, M. B. Howell, appearing in court by counsel and waiving, in favor of his said children, all claim he might have to said amounts. And the court below directed by said decree that, inasmuch as John Elliott, one of the children of said Bailey T. Elliott, had died while yet an infant, and owing no debts, and there being no reason why his share of said investment should not be paid to his heirs in the first instance, his said interest be so paid, to-wit: to said George B. Elliott one half thereof, or $125, with interest from the 1st day of June, 1865, and to each of said infant defendants, the children of said Isabella, the sum of $41.66⅔, with like interest; the several sums thus decreed making together the said sum of $750. From this decree the cause comes here on appeal.

This is an unfortunate controversy, which has grown out of ill-feeling, engendered in respect to the distribution of

the estate of George W. Elliott, among his heirs at law, all of whom are near relatives. By the decree complained of, the appellee and said infant defendants, the children of said Isabella, have a preferred claim against the estate of their uncle, and former guardian of the appellee George B. Elliott, and Isabella Elliott and John Elliott. By this decree all claims set up by the bill are rejected, save and except the investment made by said guardian in the house and lot in the town of Hampton. The sole question for determination by this court is, whether or not it was error in the court below to decree the amount of that investment as a charge upon the estate of George W. Elliott; or, in other words, was the sum so invested by said Elliott, as guardian of his brother's children, lost to them by the bad faith or gross negligence of said guardian? The case turns upon this single inquiry.

The principle upon which guardians and other fiduciaries are held accountable is, that in whatever they do they shall act in good faith, and with the same wisdom and discretion that a prudent man is accustomed to exercise in the management of his own affairs. 2 Barton's Chy. Pr. 702; 1 Minor's Inst. 448; *Knight* v. *Lord Plymouth,* 3 Atk. 480; *Thompson* v. *Brown,* 4 Johns. Chy. R. 619; *Taylor* v. *Benham,* 5 How. 233; *Elliott* v. *Carter,* 9 Gratt. 541; *Myers* v. *Zetelle,* 21 Gratt. 758 to 760.

In the last named case, Christian, J., delivering the opinion of this court, said: "There has been great uniformity in the decisions of the English and American courts in the application of the equitable principles which fix the liability of trustees and other fiduciaries, with respect to the trust subject; and I believe no case can be found where a trustee, guilty of no *mala fides,* has ever been held responsible for a loss occurring from a mere error of judgment, without any wilful default on his part when the act done was within the power under which he acted."

So, in *Elliott* v. *Carter and als., supra,* Lee, J., speaking for
the court, said : " When trustees have intended to dischage
their duties fairly, I think they should be treated with ten-
derness, and due caution taken not to hold them liable on
slight or uncertain grounds."

Squared by these principles, how stands the case under
consideration? Here, by proper proceedings in a court,
not only of competent jurisdiction, but one especially
charged by statute with the custody of such subjects, one
piece of real estate is sold, the interest of the widow in the
proceeds is paid to her, and the residue, belonging to her
children, is, by their guardian, promptly invested in another
piece of real estate—a home for mother and children—
which they enjoyed under circumstances of peculiar ad-
vantage to them for a long period of years—until, in fact,
from tender infancy these children attained nearly to ma-
ture years, and then the buildings are destroyed by fire,
and only the bare lot is left to represent the investment.
There can be no question as to the authority of the guardian
to make such investment, nor has any question been raised
as to the wisdom or propriety of this investment, which
was a boon to the mother and her children. It is the duty
of a guardian to invest properly the funds coming to his
hands, belonging to his wards, and for his failure to do so
he will incur responsibility according to the nature of the
case and its attendant circumstances. The burthen of com-
plaint in this case is not that the investment was made as
made, but that the property invested in was conveyed to the
mother and not to the children, whose money had pur-
chased it ; that thereby it was lost to the children, it hav-
ing been sold to pay their mother's debts ; the children
having grown up under the belief that it was their mother's
property and not theirs.

This pretension is not and cannot be borne out by the
facts. It might be if the conveyance to the mother had

been made directly by the guardian, or by his direction, or at his instance, or by his connivance; for he would, in either event, have been guilty of bad faith. So far from such being the case, it is not charged in the bill, nor does the record disclose at whose instance the conveyance was so made, or that it was known to this guardian until some years afterwards, when he was informed of the irregularity by his then agent and attorney, Thomas Tabb, now his administrator and the appellant here. The irresistible inference is that it was a mere mistake, and when discovered steps were promptly taken to correct it, and for all practical purposes it was corrected so as fully to protect the rights of said wards by obtaining from the mother the deed before referred to, to be held as an *escrow* until said children should arrive at their majority, when they could assert their rights by enjoying their property or by relinquishing their rights to their mother, as to them might seem best.

It is of no avail to say that by sharp-sighted vigilance the guardian might have prevented the improper conveyance or mistake, for whatever the error was, it was substantially cured by the guardian in procuring from Mrs. Elliott the deed before referred to; at the time of the execution of which these wards must have been, respectively, about eighteen, sixteen, and fourteen years of age, and, living with their mother, as they were, it is incredible that they did not know all about it. That they did have such knowledge is borne out, certainly to some extent, by the deposition of George B. Elliott himself, who seems to have been prominently active in this litigation. He, on cross-examination, admits that he visited his uncle and former guardian in Virginia, in the year 1867 or 1868, long after he became of age, and when asked if he had, after arriving at age, ever said anything to his uncle in regard to the claim asserted in this suit, answered: "I do not remember

of ever having done so "; and when further asked if he would ever have brought suit against his uncle for a settlement of his transaction as guardian, he again answer: " I do not think I would have paid any attention to the suit had he lived. Whatever was coming to my father's heirs, so far as I was concerned, would have gone to my mother. I considered myself able to make a living, and they (meaning his mother and uncle) had both done a good part by me ; hence, *they* might have settled *it* as they thought proper." These answers tend strongly to show (1) that at least, so far as George B. Elliott was concerned, there was no just charge against this guardian ; (2) that had said guardian, his uncle, lived, no such charge would ever have been made ; (3) that he (George B. Elliot) knew of the deed, made and delivered by his mother as an escrow, and intended to guard against the evils which might flow from the mistaken conveyance to her, and intended, all the time, to relinquish his interest in said investment to his mother. Moreover, the deposition of Thomas Tabb, the administrator of said guardian, proves that Geo. B. Elliott had information of all these facts directly from him when he came to Virginia to look after his interests, as one of the heirs of his uncle, and received from said Tabb, as administrator, a portion of his distributive share in said estate, without asserting, at this late day, any claim as set up in this suit.

It is manifest that this suit was an after thought; and this is also borne out by the further admission made by said George B. Elliott, when, in his deposition, on cross-examination, he was asked why he did not, on his visit to his uncle in 1867 or 1868, then ask for and have a settlement with him, he answers: " I had not seen him for years. I had only four or five days to remain. My visit was for pleasure and reunion, not to discuss dollars and cents. Moreover, I had paid no attention to the estate; had the

utmost confidence in him, and knew that whenever it suited his convenience he would settle. *The same confidence and feelings entertained for him, however, does not descend to his administrator or heirs.*" This is the key that explains the whole matter. This suit had its inception without any just claim to rest upon, and has been kept unhappily alive by unfortunate strife between blood-relations, the heirs at law and next of kin of a generous dead relative, whose life and earnings were in the main devoted to their welfare and happiness.

There is no pretence that George W. Elliott ever appropriated, as guardian, one dollar, or one cent even, of his ward's money to his own use, or that he ever in any way misappropriated any part of it. His estate, after his death, and after all his acts of generosity to his wards, is sought to be charged with a claim which, at the utmost, has no foundation other than a mere mistake; a claim which would never have been presented had he lived, and which in justice and good conscience should never have been made against his estate after his death. It is not just, it is not lawful, that sanction should be given to claims asserted against fiduciaries under such circumstances; for to do so would be to deter worthy men from the assumption of such relations, under such responsibility, as would not be willingly incurred by prudent men. Such a policy would be highly detrimental to the public, and opposed to the uniform current of decisions, both English and American, on the subject. Hence the remark of Lord Hardwicke, in *ex parte* Belchier, that "these rules should not be laid down with such strictness as to strike terror into mankind acting for the benefit of others, and not their own."

Where there is no bad faith, no wilful default on the part of one in the situation of a trustee or other fiduciary, the courts will always favor him. So in *Thompson* v. *Brown,* 4 Johns. Chy. R. 619, Chancellor Kent declares

that "where there is no just imputation of *mala fides*, and the fault is at most but an error of judgment and a want of sharp sighted vigilance, it would have the appearance of great rigor and be hardly reconcilable with the doctrines of the court to hold a trustee responsible." And in *Hart* v. *Ten Eyck*, 2 Johns. Chy. R. 62, the same chancellor says that he should always be extremely averse to hold such characters responsible on slight grounds where there is evidence of fair and upright intention.

It is impossible to discover in this case any bad faith, any wilful neglect. On the contrary, the whole case teems with the evidences of integrity and good faith; with evidence that this guardian, free from all desire for personal gain, assumed the position of guardian to his dead brother's children only that he might bestow, as he did, to better advantage, a bounty compared to which their little patrimony was a trifle. Looking at all the circumstances, in no possible view can the claim asserted be sustained. For these reasons we are of opinion that the decree appealed from is clearly erroneous, and must be reversed and annulled and a decree entered dismissing the claimants' bill.

DECREE REVERSED.