# Richmond.

## WAYLAND & WIFE v. CRANK'S EX'OR.

### December 4, 1884.

1. PRACTICE IN CHANCERY—*Answer as Cross-bill.*—Where answer contains charges, and makes demands against complainant, which, by strict rules of pleading, could only be set up by bill or cross-bill, a court of equity will consider and treat such answer as a cross-bill, so as to enable it to do complete justice in the case. *Mettert* v. *Whitlock*, 18 Gratt. 235.

2. APPEALS—*Interlocutory Decrees.*—There is no statutory bar to the time within which a petition may be filed to correct error in an interlocutory decree; and rehearing is granted or denied at the sound discretion of the court. *Kendrick* v. *Whitney*, 28 Gratt. 646.

3. FIDUCIARIES—*Liability.*—It is well settled in this state that if an executor honestly exercise the discretion conferred on him by the will, he cannot be held liable for any loss which may have happened through a mere error of judgment. *Cooper* v. *Cooper*, 78 Va. 198.

4. IDEM—*Purchases at their Own Sales.*—An executor may not lawfully, directly or indirectly, purchase at his own sale, but he may lawfully purchase for his own benefit property, though it may have been previously purchased by his vendor of himself as such executor; provided, of course, the transaction be real and *bona fide*. *Staples* v. *Staples*, 24 Gratt. 225 . And this is true *a fortiori*, when the transaction was not only real and *bona fide*, but was sanctioned by the court with all the facts before it. *Hurt* v. *Jones*, 75 Va. 341.

5. IDEM—*Sales for Currency.*—Sale by executor of testator's perishable property, not exempt from sale, in January, 1865, for the only currency then in circulation, was not only allowable, but in accordance with the mandate of the statute. Code 1873, ch. 126, § 16. Rules applicable to transactions of fiduciaries during the war depend on the circumstances of each case. *Dickinson* v. *Helms*. 29 Gratt. 462.

6. IDEM—*Sale—Cestui que trust.*—At sale of testator's perishable property executor should decline to allow a legatee, for whom he is trustee, and

who has only a life-interest in the *corpus* of her legacy, to make purchases on account of her interest in the estate.

Appeal from decrees of circuit court of Albemarle county, pronounced in the years 1881, 1882 and 1883, in the cause of Crank's Executors against Crank's Heirs, &c.

R. G. Crank died in 1881, leaving a will in which W. G. Farish was named as executor. The will gave executor privilege of taking testator's farm, "Home Place," at $15 per acre, and if he refused to do so, his brother, T. M. Farish, was given same privilege; and in event of his refusal, executor was required to sell it. Executor and brother both refused to take it, and it was sold at public auction and purchased by Frank P. Farish, another brother of executor, at $13.50 per acre. Purchaser was ready and willing to comply with terms of sale. Executor thereupon sent to each of the parties interested a copy of the letter set out in the opinion, offering to cancel the sale if any one of them objected to it, but expressing opinion that the land would bring less at second sale, and saying that his brother Frank would probably be willing to buy at second sale, and that if he could get the land for less would do so. Some of the parties objected to the sale, and the land was resold, and Frank again became purchaser, at $10.30 per acre. Between first and second sales executor filed his bill in circuit court, asking that the estate be administered under its direction. He set out first sale and its cancellation, and by an amended bill reported second sale to court for confirmation. Defendants, Twyman and wife, Michie and wife, and Wayland and wife, answered the bill, charging a *devastavit* against executor in sale of "Home Place," objecting to confirmation of second sale, and seeking to hold him liable for difference between the two sales. Wayland and wife also sought to charge estate of testator, R. G. Crank, for his alleged *devastavit* as executor of George Crank, deceased, in selling the personal property of that estate in March, 1865, for Confederate currency. By decree of October 14, 1881, the court approved

conduct of executor in reference to first sale, but refused to confirm second sale, and ordered a resale, and referred the cause to a commissioner to take certain accounts. "Home Place" was resold, and Frank P. Farish again became purchaser at $10.30 per acre, but transferred purchase to T. M. Farish, and the sale was so reported to the court and confirmed. T. M. Farish, before the purchase money had been paid, transferred the purchase to executor, Wm. G. Farish, as trustee for his wife, and this was reported to the court and approved, without exception, and a deed was directed to be made to the trustee when the purchase money should have been fully paid. A commissioner having reported against the claim of Wayland and wife, seeking to charge the estate for the *devastavit* of R. G. Crank as executor of W. G. Crank, the court, by decree of May 21, 1883, overruled their exceptions and confirmed the report. And from this decree the appellants appealed. All other facts appear in the opinion.

*Samuel B. Woods*, for the appellant.

*Watson & Perkins*, for the appellees.

LEWIS, P., delivered the opinion of the court:

If, upon the principle recognized by this court in *Mettert's Adm'r* v. *Hagan*, 18 Gratt. 231, and in *Kendrick* v. *Whitney*, 28 *Id.* 646, and other cases, the answer of the defendants, Wayland and wife, the appellants here, is treated as a cross-bill, then the case, as made by the pleadings, presents certain demands by the appellants against R. G. Crank's executor, which are sought to be maintained on two grounds: 1. Upon the alleged *devastavit* of the executor in cancelling the sale made by him of the "Home Place," at the price of $13.50 per acre, to F. P. Farish, and his alleged consequent liability for the difference between the amount of that sale and the price subsequently obtained;

and, 2, upon the alleged misconduct of R. G. Crank, as executor of George Crank, deceased, in making sale of the personal estate of his testator in March, 1865, for Confederate money.

In this view of the case, it is plain that the four decrees complained of, relating to the sale of the "Home Place," were interlocutory in their character, and that the decree of the 21st May, 1883, confirming Commissioner White's report, and rejecting the claim of the appellants, growing out of the sale of the personalty, was a final decree. For it was not until that decree was entered that the case was fully disposed of, so far as the appellants were concerned. *Harvey & Wife* v. *Bronson*, 1 Leigh, 108; *Ryan's Adm'r* v. *McLeod and others*, 32 Gratt. 367; *Rawling's Ex'or* v. *Rawlings and others*, 75 Va. 76; *Norfolk Trust Co.* v. *Foster*, 78 Va. 413. The appeal was therefore taken in time, and the motion to dismiss must be denied.

Then as to the merits. The testator in his will valued the land at eighteen dollars per acre, which by a subsequent clause he changed to fifteen, and empowered the executor to sell it. Soon after the testator's death it was offered for sale at public auction, and knocked off to the highest bidder at the price of thirteen dollars and fifty cents per acre. In this state of things, the executor being in doubt as to the proper course to pursue, determined to inform the legatees, who were numerous, and many of whom resided in distant states, of the sale that had been made, and to request their views respecting it. He was himself a legatee under the will, and the purchaser was his brother. Accordingly, he addressed a letter to the parties, in which, after referring to the sale, he said: "As the price fixed by Colonel Crank in his will was $15, I was in hopes the land would go to that, and so was Frank. The latter was trying to make it bring that price in good faith; willing to buy it for less, if he could, but also entirely willing that some one else should have it at $15. In this effort the land was knocked down to him at $13.50. I honestly think this is as much as it will bring, still I am anxious to do all in my power to meet the

wishes of those concerned, and, hence, I write this letter to you, and a similar one to all the other parties in interest. If you, or any. one of the parties, object to the sale to Frank, please say so, and he is perfectly willing to give· it up, and let the place be advertised and offered again. If, on the other hand, all of the parties are content to let the sale stand, Frank will at once comply with the terms. Should there be objection, and a resale in consequence, I am very much inclined to believe that the property will bring less. Frank may, and probably will, be willing to buy at the next sale, and if he is, and can get it for less than $13.50, he will of course do so. On the other hand, it may bring more, but I do not think Frank will go beyond his present bid. I do not consider myself in any way bound to . write this to the parties and require their opinion, because I believe this sale is a good one, and know it was fairly made. Still, I do so in deference to them, and will thank you to respond at once. If I do not hear from you by the 5th day of May, I shall close the sale at the price of $13.50."

To this letter some of the parties—how many the record does not disclose—replied, expressing emphatic dissatisfaction and positive objection to a sale at the price offered. None expressed approval, and accordingly the executor, with the assent of the purchaser, abandoned the sale. His action in this particular is assailed by the appellants as in bad faith, and as an unwarranted delegation to others of his duties as a fiduciary. But the charge is not sustained by the proofs in the record. In an honest effort, as he says, to sell the land for the highest price it could be made to bring, he had failed to realize the smallest sum at which the testator had valued it. Unwilling, however, to cancel the sale, and yet hoping that by another effort he might be able to obtain a better price, he sought the advice of the parties in interest, after candidly and fully informing them of the exact state of the case. Here, there was no delegation of duty or responsibility, but rather the evidence of an anxious desire, in a doubtful case, to consult their wishes. Nothing was concealed; all

was fair and open. He doubtless deemed it safer to pursue the course he did, rather than, by consummating the sale to his brother, to run the risk of future litigation with those who might be dissatisfied with it. And in view of the emphatic objection which was expressed by all the parties who responded to his letter, it is not improbable that if the sale had not been abandoned, costly and protracted litigation would have resulted. The appellants themselves, though making no response to the letter, or in any way expressing approval or dissent, would seem to have been dissatisfied with the sale, for in their answer they aver that the land was represented to be worth at least fifteen dollars, and by some persons twenty dollars, per acre. Then, who can say that in cancelling the sale, the executor was not acting in accordance with their own wishes at the time?

It is true that, by the course pursued, loss to the estate has resulted; but, on the other hand, it is equally certain, from the record before us, that it cannot be attributed to bad faith on the part of the executor, or to the want of the reasonable prudence which is required of fiduciaries in the execution of their trusts. In *Cooper* v. *Cooper's Ex'or*, 77 Va. 198, Judge Fauntleroy stated the settled rule to be, that if an executor honestly exercises the discretion conferred upon him he cannot be held liable for any loss which may have been occasioned by an honest error of judgment. And again, that "good faith and ordinary prudence are all the law requires, or ought to require, of an executor or trustee." Citing *Elliott* v. *Carter*, 9 Gratt. 541; *Davis* v. *Harman*, 21 *Id*. 194; *Douglass* v. *Stephenson's Ex'or*, 75 Va. 747, and other cases. See also *Elliott's Adm'r* v. *Howell*, 78 Va. 297. Here the executor was himself an interested party, and as evidence of his desire to faithfully perform his duty, he sought, as he had a right to do, the aid and direction of a court of chancery. Nor is there anything in the record to sustain the charge, for the first time made in this court, that he was indirectly the purchaser at his own sale, which was afterwards made under a decree of the circuit court. The sale was publicly made after due

advertisement, and the land was knocked off to F. P. Farish, the highest bidder (this time at the price of ten dollars and thirty cents per acre), who afterwards transferred his purchase to T. M. Farish, all of which was reported to the court, and the report was confirmed. Afterwards, T. M. Farish transferred his purchase to the executor, William G. Farish, as trustee for his wife, Maggie V. Farish, which was also duly. reported, and, without exception by any one, the transaction was ratified and approved by the court. The entire transaction was in good faith, and there is no proof whatever to the contrary. The well-established rule, therefore, which forbids an executor to purchase, either directly or indirectly, at his own sale, has no application to the present case. In *Staples* v. *Staples*, 24 Gratt. 225, Judge Moncure, after referring to the rule, said : " But it is certainly true that an executor, or other trustee, can lawfully purchase for his own benefit property, though it may have been previously purchased by his vendor of himself as such executor or other trustee; provided, of course, that the transaction be real and *bona fide.*" In this case, not only was the transaction " real and *bona fide,*" but was sanctioned by the court with the facts before it. See also *Hurt* v. *Jones & Wife,* 75 Va. 341. It is unnecessary, however, to further notice this objection, inasmuch as no such question was raised by exceptions or otherwise in the circuit court, and as the only claim asserted in the answer, in respect to the land, was for the difference between the amount of the sale, which was cancelled, and any smaller sum it might afterwards bring under the decree of the court. And as, for the reasons already stated, this claim is without foundation, it only remains to inquire whether the action of R. G. Crank, as executor, was proper in selling the personal estate for Confederate money.

It appears that George Crank, late of Albemarle county, died testate in January, 1865, and that in February, of that year, R. G. Crank qualified as his executor. At that time, the county of Albemarle was exposed to the raids of Federal troops, and

was liable at any time to be occupied and held by them. The personalty, which consisted in part of bacon, corn, flour and other like articles, was thus not only exposed, but was in danger of being consumed· or destroyed. Under these circumstances, what was the executor to do? The statute as it then was, and is now, required him to sell, as soon as convenient, such of the personalty, not exempt from sale, as was likely to be impaired in value by keeping; and was he to disregard the mandate of the statute, and take upon himself the risk of the total loss of the property at the hands of an hostile army, or was it his duty to sell it for the only currency then in circulation, although greatly depreciated in value? He chose the latter course, and a portion of the money he received perished on his hands before he could invest it. The female appellant was entitled, under the will,.to a life interest in one-sixth of the personalty, and her brother, the executor, had been appointed her trustee. It appears that of the parties in interest she alone objected to the sale for Confederate money, although she requested to be permitted to buy at the sale, on account of her ·interest, bacon and other articles for family consumption. This the executor refused to do, and upon this ground it would seem that her objection to the sale was chiefly based. No claim, however, was asserted by her against the executor in his lifetime, nor until her answer was filed in the present suit, which was more than sixteen years after the sale was made. We think the claim was properly rejected. It has been repeatedly held by this court that the rules to be applied to the transactions of fiduciaries during the war must depend upon the particular facts and circumstances of each case. *Myers* v. *Zetelle,* 21 Gratt. 733; *Williams' Adm'r* v. *Skinker and Wife,* 25 *Id.* 507; *Bedinger* v. *Wharton,* 27 *Id.* 857; *Dickinson's Adm'r* v. *Helms and others,* 29 *Id.* 462. Under the circumstances of the present case, the executor was well warranted in selling the property, as he could not then foresee, what we all now well know, that the downfall of the Confederacy and the total destruction of its

currency was at hand.   He acted in good faith and with the best judgment he could form at the time, and ought not, therefore, to be held responsible for the unforeseen loss that occurred. *Elliott* v. *Carter*, and other cases cited, *supra*.   Moreover, Mrs. Wayland being entitled only to a life-interest in the property, the executor, who was her trustee, properly refused to permit her to buy on account of her interest; for had he done so, he would have rendered himself responsible to the remainder-men for his unwarranted delivery to the life-tenant of the *corpus* of the trust estate.

There is no error in the decrees complained of, and the same are affirmed.

RICHARDSON and FAUNTLEROY, J's, dissenting.

DECREES AFFIRMED.