KETCHUM v. KETCHUM.

1. EXECUTORS AND ADMINISTRATORS — ESTATES OF DECEDENTS— SALE BY ADMINISTRATOR TO HIMSELF—FRAUD—PRESUMPTION.

While it is presumed that a sale of real estate by an administrator to a third person who thereafter conveys to the administrator, is void, the presumption is not conclusive; evidence showing good faith or sufficient consideration may be enough to rebut the presumption. 3 Comp. Laws, § 9095 (4 How. Stat. [2d Ed.] § 11248).

2. SAME—EVIDENCE—VALUE.

Where the administratrix of an estate sold real property of the estate to pay debts, for a consideration of $900, taking a deed from the purchaser to herself on the same day, for the same consideration, and it appeared that the value of the property was $900, that it had been appraised at $950 and before it was sold a second appraisal was made at $900, the sale was voidable only, and the evidence tending to show good faith and sufficient consideration, uncontroverted, sustained the validity of the transfer.

3. SAME—FRAUD.

Held, also, that the evidence was insufficient to establish either actual fraud or the claim that the administratrix was interested in the sale to such an extent as to invalidate it.

Appeal from Shiawassee; Miner, J. Submitted June 3, 1913. (Docket No. 26.) Decided September 30, 1913.

Bill by Ada Ketchum and another against James Ketchum and another to correct a mistake in the description of certain deeds. Defendant filed a cross-bill setting up the invalidity of the conveyances in question. From a decree for complainant, defendant Ketchum appeals. Affirmed.

*Walter M. Bush,* for appellant.

*Pulver & Pond,* for appellees.

MOORE, J. The bill of complaint in this case is filed for the purpose of correcting a description in two real estate deeds. From a decree in favor of the complainant, the defendant James Ketchum has brought the case here by appeal.

On August 14, 1908, Daniel Ketchum died, leaving as his widow the complainant Ada Ketchum. She is the daughter of defendant Griselda Russell. The defendant James Ketchum, who resides in Virginia, is the brother of Daniel Ketchum, the deceased. Daniel Ketchum left no children and no brothers or sisters except James Ketchum. After due notice on September 14, 1908, Ada Ketchum was appointed administratrix of the estate of her deceased husband. She gave a bond and entered upon the duties of her office. Appraisers of the estate were appointed and a warrant and inventory issued. These appraisers took the oath of office and returned under oath as follows:

"In the Matter of the Estate of Daniel Ketchum, Deceased.

"A true and perfect inventory of all the real estate, goods, chattels, rights and credits of said estate, to wit:

.East half of lots 2 and 3, block 14, of the city
    of Owosso, Michigan ....................... $950 00
Household furniture ......................... 75 00"

The administratrix filed an affidavit that the above
was all the property belonging to the estate.   Com-
missioners on claims were appointed who entered
upon their duties and after due notice allowed claims:
Owosso Grocery Company, $6.80; Griselda Russell,
$597.85.  They made due report of their findings and
of their fees as $4 each.  On February 3, 1909, the
administratrix filed a petition for leave to sell the real
estate.  In that petition it was stated:

"Your petitioner further represents that as far as
can be ascertained, and as she is informed and verily
believes, the just debts and valid claims outstanding
against said estate amount to $604.65, exclusive of
interest, and also about $160 funeral charges and
taxes, and that the charges and expenses of manag-
ing and administering said estate, including future
probable charges and expenses, will amount to about
$100.  Your petitioner further represents that it is
necessary, for the purpose of paying said debts, valid
claims, charges, and expenses, to raise the sum of
about $900 or thereabout by the sale of the following
described real estate, or some part thereof, of which
the said deceased died seised and possessed.  The de-
scription, condition, and value of each parcel and of
the whole of said real estate of which said deceased
died seised and possessed, according to the information
and belief of your petitioner, are as follows, viz.:
The E. ½ of lots 2 and 3, block 14, of the city of
Owosso.  Your petitioner further represents that the
value of said real estate described above, according
to her best judgment and belief, does not exceed the
sum of $1,000.  And your petitioner further repre-
sents that the names and residence of the next of kin
and heirs at law of said deceased and other persons
interested in said estate, as your petitioner is in-
formed and believes, are as follows:  Your petitioner,
the widow of said deceased, Owosso; James Ketchum,
brother of said deceased, Burkley, Va."

Due notice of this application was published and.

affidavits of two freeholders were filed that a fair valuation of the property was $900. On March 8, 1909, the administratrix was authorized to sell at private sale the real estate for $900. She gave a bond and reported that she had made the sale to Mrs. Russell for $900 and asked that it be confirmed. It was confirmed by an order duly entered by the judge of probate March 17, 1909. After due notice of hearing Mrs. Ketchum filed a detailed final account as administratrix, showing that there had come into her hands as administratrix $975, $900 of which was from the sale of the real estate, and that she had disbursed $987.19. The only items in this account in favor of herself were household furniture $75, commission as administratrix, $45. This final account was duly allowed and the administratrix was discharged.

The deed from the administratrix to Mrs. Russell was made and placed on record March 18, 1909. Later, and upon the same day, Mrs. Russell made a quitclaim deed of the premises to Ada Ketchum, the consideration of which was stated to be $1 and love and affection, which deed was recorded in May, 1909. In January, 1911, Mrs. Ketchum made a land contract for the sale of this land to Christ Episcopal Church for $2,000. Later it was discovered that a mistake was made in the description in the two deeds, and this bill was filed June 14, 1912, to have them corrected. The defendant James Ketchum filed an answer in the nature of a cross-bill claiming the deeds were fraudulent and void, asking that they might be canceled and that he might be decreed to be the owner of a one-half interest in the premises.

The hearing was in open court. No witnesses were sworn on the part of defendant, and but one exhibit was introduced by him, and that was the claim presented on the part of Mrs. Russell to the commission-

ers. The trial judge made a decree as prayed by the complainants. The case is brought here by appeal.

Counsel argue appellants claim under the following heads:

(1) The presumption of fraud is conclusive as a substantive rule of law.

(2) Christ Episcopal Church is not a bona fide purchaser.

(3) The evidence shows actual fraud.

(4) Complainant Ada Ketchum was interested in the sale.

(5) Accounting. Counsel for appellee concede that if either 1, 3, or 4 is established the decree of the court below is wrong.

1. Is the presumption of fraud conclusive as applied to this case? We quote from the brief:

"The presumption of fraud is conclusive as a substantive rule of law. 3 Comp. Laws, § 9095 (4 How. Stat. [2d Ed.] § 10248):

" 'The executor or administrator making the sale, and the guardian of any minor heir of the deceased, shall not directly or indirectly purchase, or be interested in the purchase of any part of the real estate so sold, and all sales made contrary to the provisions of this section shall be void,' etc.

"Both deeds being executed on the same day, between the same parties, and covering the same land, the presumption of collusion is conclusive, the same as is the presumption that a child under the age of seven years is incapable of committing a crime, regardless of what the evidence might show"—citing *Clute* v. *Barron*, 2 Mich. 192; *McKay* v. *Williams*, 67 Mich. 547 (35 N. W. 159, 11 Am. St. Rep. 597); *Winter* v. *Truax*, 87 Mich. 324 (49 N. W. 604, 24 Am. St. Rep. 160); and other authorities.

Are these cases controlling in favor of the defendant? In the first of these cases the sale was made by a public officer directly to himself. Clearly not the case before us.

In the case of *McKay* v. *Williams*, *supra*, it appears that Mrs. Shults gave to her husband a power

of attorney to sell and deed lands. On the same day he deeded the land to one Knight, who on the same day executed a deed back to the husband. We quote from the opinion:

"Both these deeds purported to be for the consideration of $600. The notary who drew the deeds and took the acknowledgments saw no money consideration pass between the parties. Both deeds were recorded the same day and at the same time. * * *

"In holding that the deeds introduced by the defendants are *prima facie* void upon their face, we do not militate against the rule declared by this court in several cases, that in ejectment all defenses are excluded that are not legal," etc.

Suppose in that case it had appeared that the full value of the property had been paid when the power of attorney was executed, or when the deed from Mr. Shults to Mr. Knight was made, would it not have overcome the *prima facie* case spoken of by CHAMPLIN, J.?

In *Winter* v. *Truax, supra,* the following language is used in the opinion:

"Cyrus A. Kellogg may possibly have acted throughout without fraud, and for the benefit of his ward, but this record does not show it. So far as he, as guardian, conveyed to Wright, and Wright immediately reconveyed to him, individually, for the same consideration, no title passed by the transaction. This case must be ruled by the case of *McKay* v. *Williams,* 67 Mich. 547 [35 N. W. 159, 11 Am. St. Rep. 597]. The whole record abounds with evidence of the efforts of Kellogg to get the legal title to this land in his individual name; and aside from the deed from Wright to him, which is void, his transactions would require very satisfactory evidence to explain why he assumed fiduciary relations with the estate of Helen E. Tucker, if he already had a valid title through Cole and Lewis."

In *Taylor* v. *Brown,* 55 Mich. 482 (21 N. W. 901), the following appears in the opinion:

"The premises in question were regularly sold and conveyed under proper license for that purpose, by the executors of Jonathan B. Taylor, to pay debts of his estate to Caroline Taylor, who was, at the time she bid off the same at such sale, guardian for said minors. The facts in the case are all stipulated by the parties, from which it appears that, upon the sale of the property to Caroline, she paid the full cash value therefor, and that the sale was fairly and in good faith made by the executors, as was the purchase by Caroline, and that her guardianship was known to the executors at the time the sale was thus made. With a full knowledge of all the facts, the sale to said Caroline was regularly confirmed by the judge of probate, and in her capacity as guardian she accounted to the said executors for the purchase money of said property; they receipting the same to her accordingly."

The land was later sold to the defendants. Later one of the minors, after he became of age, brought ejectment for an undivided one-third interest. The court declined to hold that the executors' sale was void.

In *Otis* v. *Kennedy*, 107 Mich. 320 (65 N. W. 221), it is said in part:

"In *McKay* v. *Williams*, 67 Mich. 547 [35 N. W. 159, 11 Am. St. Rep. 597], Mr. Justice CHAMPLIN, referring to section 6042, 2 How. Stat. [1st Ed.], said:

" 'This statute was merely an affirmance of the common law.'

"We are therefore compelled to hold, both upon reason and authority, that sales of the kind in question are voidable only. The statute must be read in connection with the registry laws. 2 How. Stat. [1st Ed.] § 5683.

"Upon the question of whether there was evidence upon the face of the record to create in the minds of the defendants such a suspicion of bad faith in the executor as to put them upon inquiry, it appears that Pillard did not purchase until one month after the sale to Leonard. It is true that the deed to Leonard was not recorded until the date of the execution

of the deed back to Pillard; but it frequently occurs that deeds are not put upon record on the date of their execution. We think this fact could not be construed as notice to a subsequent purchaser that anything was wrong about the purchase by Pillard, especially in view of the fact that the consideration in the deed to Pillard was greater than the purchase price recited in the Leonard deed, and also in view of the settled rule that the subsequent purchase by an executor of land which he has previously and in good faith sold under license of the probate court is legal. That such purchases are legal is held by Woerner in his work on the American Law of Administration (section 334, p. 702), in which the author says:

"'But the rule that an administrator cannot buy indirectly or acquire the property sold by him as administrator by the interposition of a third party does not extend to a subsequent bona fide purchase by him from one who himself purchased in good faith at the administrator's sale.'

"This doctrine is supported by *Wayland* v. *Crank,* 79 Va. 602; *Welch* v. *McGrath,* 59 Iowa, 519 [10 N. W. 810, 13 N. W. 638]; *Staples* v. *Staples,* 24 Grat. [Va.] 225; *Silverthorn* v. *McKinster,* 12 Pa. 67; *Creveling* v. *Fritts,* 34 N. J. Eq. 134."

As has already appeared, when the property was inventoried it was appraised at $950. Before it was sold it was also appraised at $900. Upon the trial of the case now before us it was shown that $900 was a fair price for the land when it was sold. This was shown by witnesses who lived adjacent to it, and there is no evidence to the contrary unless it may be inferred from the fact that two years later it was sold on land contract to Christ's Episcopal Church for $2,000. This inference is met by the undisputed testimony of witnesses that during that two years there had been a marked increase in real estate values in that vicinity.

The church warden and chairman of the building committee testified as to values:

"*Q.* What would you regard as a fair cash value of the property in controversy in March, 1909?

"*A.* Well, there was quite a change along there just before that and just along about that time in values, before and after, but just at that time there was quite a depression in the city. I bought good houses and lots in Owosso for $400 that I afterwards sold for $800 or $900 within a year. I was familiar with it at the time the price was made, and I considered very seriously of buying it for the church at that time, and we thought at that time it was worth somewhere around $900 or $1,000.

"*Q.* What would you say as to the sum of $900 being a fair cash value for it at that time?

"*A.* At that time I think it was."

Mrs. Ketchum testified that when her mother bought the property she intended to live there so as to be near the church, and that it was not until she (Mrs. Ketchum) declined to move there with her mother, on account of the property being associated with the death of her husband, that her mother gave up the idea of living there and decided instead to deed the property to her only daughter Mrs. Ketchum. If these were the facts, the *prima facie* case made by the deeds was fully met.

3. Does the evidence show actual fraud? In support of this claim it is said Mrs. Ketchum is guilty of fraud because she made out the claim of her mother and swore to it before the commissioners. This claim which was presented shows that Mrs. Russell paid to the Ketchums January 15, 1902, $30, and from that time until the death of Mr. Ketchum, upon 17 different occasions, sums of money ranging from $4 to $79. It is unfortunate that after this suit was begun, and before the trial, Mrs. Russell died. The attorney who looked after the business, it is conceded at the time of the trial, was incompetent both physically and mentally to testify. Mrs. Ketchum swore that she kept this account for her mother, who was an old lady, and that she knew the sums of money were loaned as stated, and for that reason she swore

to the account before the commissioners. If this is true, what she did does not convict her of fraud nor of any improper conduct.

It is nowhere claimed in the cross-bill that there were no debts against the estate of Mr. Ketchum. It is claimed therein that there was collusion between Mrs. Russell and Mrs. Ketchum. The following appears in the cross-bill:

"This defendant further avers that said complainant Ada Ketchum, with the intention of defrauding this defendant out of his interest in said estate and said property, in and by said scheme and as is set forth and described in said bill of complaint, obtained possession and control of the property involved in this suit at an expense or cost to her, as this defendant is informed and verily believes and charges the truth to be, of not to exceed the sum of $900, and that thereafter said complainant Ada Ketchum sold the said property to the said Christ Episcopal Church, upon a contract, for the sum of, to wit, $2,500, thereby defrauding said estate and this deponent out of the sum of, to wit, $1,600."

The land contract shows a consideration of $2,000 and not $2,500, and this contract was made nearly two years after the sale.

No proceedings have ever been taken to set aside the allowance of claims or the allowance of the final account, which included funeral expenses, doctor's bill, and expenses of administration.

4. Was complainant interested in the sale? The claim that she was is based upon the fact that her mother had, prior to the sale, for the purpose of making a testamentary disposition of her property, made conditional deeds to real estate to her daughter, and that to enable her mother to borrow money to pay the funeral and other expenses the daughter joined with her in making a note and mortgage to the bank, where the money was borrowed. It is the testimony that at this time Mrs. Ketchum had no property of

her own except her interest in her husband's estate and her interest in the real estate so deeded by her mother, and that the loan from the bank was made to Mrs. Russell.

This is a chancery case where the defendant James Ketchum is asking affirmative relief upon his cross-bill. The record shows that when Daniel Ketchum died he left nothing except this house and lot worth $900 and household goods worth $75. It also shows that, when his debts were paid and the last illness, funeral, and administration expenses were met, the estate was exhausted, and there was nothing left, either for the widow or the brother. Had not real estate suddenly acquired additional value, it is not likely this litigation would have occurred.

The decree is affirmed, with costs.

STEERE, C. J., and MCALVAY, BROOKE, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.