# GRACE DOROTHEA RAICHE v. FRANCIS MARTIN.[1]

January 2, 1953.

No. 35,816.

*Freeman, Larson & Peterson,* for appellant.
*William H. Howard,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying plaintiff's motion to vacate a verdict and grant a new trial.

This appeal arose out of an action brought by Grace Dorothea Raiche against Francis Martin to recover for damage to a White tractor-trailer truck arising out of a collision between the truck and defendant's Mercury automobile. Defendant interposed a counterclaim for personal injuries and property damage. The jury returned a verdict for defendant on the counterclaim.

The collision occurred about seven o'clock on the morning of March 12, 1951, at the intersection of highways Nos. 169 and 100

[1]Reported in 56 N. W. (2d) 625.

in Hennepin County in the region of the country club district of Edina at about Fiftieth street. It appears unquestioned that highway No. 169 extends generally northeast and southwest and that highway No. 100 extends generally north and south at the approximate point of the accident. For some distance north of the intersection, highways Nos. 169, 100, and 212 are merged. South of the intersection, merged highways Nos. 169 and 212 extend southwest to Shakopee and highway No. 100 extends to the south of Savage. In the general area under consideration, where the highways approach the intersection, they are four-lane highways.

The only eyewitnesses to the collision were Bernard (the driver of the truck) and defendant, and their testimony is very conflicting in many respects.

It is undisputed that Bernard was driving the truck owned by plaintiff, his wife, with her consent and permission; that it was snowing that morning; and that there was snow and some ice on the highways which made them somewhat slippery. Bernard testified that he started out from Sixth avenue north that morning with a load of soybeans, intending to go to Savage, and that he proceeded on highway No. 100 in a southerly direction. He said that the load on the trailer weighed about 14,000 pounds; that the trailer itself weighed about 4,000 pounds; and that the tractor weighed around 9,000 pounds, making a combined weight of about 27,000 pounds. He testified that after crossing the bridge over Minnehaha Creek north of the intersection he proceeded on south at about 25 miles per hour, with no other traffic on that highway. He said that he was in the intersection in the lane nearest the center, on the right side of the highway, when he first saw defendant, who was approaching from the southwest on highway No. 169; that the rear of his truck was then just out of highway No. 169; that before he went over the center line to get onto highway No. 100, going south from the intersection, he looked up highways Nos. 100, 169, and 212 "and there was no traffic in sight"; and that, when he saw defendant's "car coming at me," weaving in the road, and going at

the rate of 50 or 60 miles an hour, he turned the tractor to the left and east of the center line in an attempt to avoid defendant's car. He said that he had reduced his speed at or about the point of the accident in order to stop at the stop sign at Fiftieth street, which was some short distance to the south. He testified that defendant's car struck the right front corner of the tractor part of the combination vehicle; that "the truck spun"; and that the tractor part of the outfit faced east and the trailer part faced south on the east side of the highway after the impact. He placed defendant's car facing south after the collision, somewhat to the south of the trailer, on the east side of the highway.

Defendant, on the other hand, placed the vehicles in a different place before and at the time of the collision. He testified that he was driving his Mercury car from Belle Plaine through Shakopee that morning; that immediately before the accident he was driving at the rate of 20 to 25 miles per hour; and that it was snowing and the highway was covered with snow, "but it wasn't too bad." He said that he first observed the truck approaching on merged highways Nos. 169 and 100 at about 25 miles an hour when he was back about 175 feet on highway No. 169; that the truck "was way over to my left" in the extreme right or west lane; that he watched it as it proceeded along and supposed that it would turn toward Shakopee at the intersection; that when he got 50 feet farther along the truck took a sharp turn to the left; that there were no signals made by the truck driver; and that "I just saw him come out there in front of me." He placed the point of collision in the intersection at a different point from where the driver of the truck said it happened. Thus, we have conflicts in the testimony as to which lane the truck was in as it approached the scene of the accident, as to the speed of the approaching Mercury, and as to the position of the vehicles in the intersection just before the impact.

The testimony of a police officer shows that after the collision the tractor-trailer combination was over on the east side of highway No. 100 with the tractor part on the extreme east side of the high-

way. Most of the tractor was in the snowbank made by the snow-plows with the back wheel on the edge of the snowbank, and the "trailer was faced in a southerly direction." Defendant's automobile was on the east side of the center line of the highway, facing in a southerly direction and "a little off to the right of the front of the trailer." The officer said that some skid marks were visible, but he was unable, "because of the snow and the ice, to determine whose they might be."

The legal issues raised by plaintiff in her assignments of error are: (1) Whether the verdict is justified by the evidence or whether it is contrary to law; and (2) whether the verdict on defendant's counterclaim is so excessive as to indicate that it was rendered under the influence of passion and prejudice.

■ In reviewing the evidence, we must necessarily do so in the light most favorable to the prevailing party. Even so, plaintiff argues, the verdict is not justified by the evidence and is contrary to law. She contends that the slippery condition of the highways that morning was such as to caution any motorist to use them with care; that the physical facts of the accident are such as to indicate that, although defendant claims that he was going only 20 to 25 miles per hour, he was going at a much greater speed, inasmuch as the impact caused the 27,000-pound tractor-trailer to move some 40 feet across the highway to the east and lodge the tractor part in the snowbank with such force as to make it difficult to release. She further contends that it would be physically impossible for the Mercury driven at a speed of from 20 to 25 miles per hour, as defendant claims it was, to push plaintiff's truck across the highway and place it in the position it was after the accident. On the other hand defendant argues that according to the truck driver's own testimony he turned the truck to the left and did not apply his brakes and that the vehicle weighing about 27,000 pounds, if turned on ice without application of the brakes, would follow the course taken by the tractor on the turn.

In connection with this phase of the case, Bernard testified that when he saw defendant's car coming toward him at a speed of 50 or 60 miles an hour, weaving on the road, he was coasting the truck on an upgrade on the power he had already gotten; that he did not apply the brakes at any time prior to the accident; that as he was coming along the highway he was "traveling around 30"; and that he "was letting up on the gas" as he approached the intersection.

Plaintiff contends that it appears from the physical facts that there was a clear violation of the statute as to speed by defendant, citing Robertson v. C. R. I. & P. Ry. Co. 177 Minn. 303, 225 N. W. 160, as authority that physical facts proved to the point of demonstration controls against the mere declaration of a witness. We have examined that case and do not consider it controlling under the facts and circumstances here. In that case, plaintiff was in the employ of defendant railway company as a section foreman and was furnished with a motorcar for use on rails. On the day in question he and some fellow employes were carrying some angle bars on the car to a point on the railroad line where they were working. While traveling at the rate of 18 or 20 miles an hour the car was suddenly derailed; plaintiff was injured and recovered a verdict. Plaintiff and two other survivors of the accident testified that as they were traveling along they heard something snap as if something was breaking and immediately afterward the rear end of the car dropped down, throwing all of them from the car. This was all that any of them knew as to what happened or caused the derailment. Plaintiff's theory was that the housings or castings holding the rear axle were cracked and gave way. He testified, in support of this, that prior to the accident he had noticed a streak of rust on the housing covering the gears in the middle of the axle and that after the accident, while lying at the side of the car, he noticed rust on the edges of some of the broken parts. Two experts, testifying in his behalf, said that the rust had affected the broken edges of the iron to such an extent that in their opinion the breaks had existed prior to the time of the accident. The theory of defendant

was that the breaking of the housings or castings was caused by an angle bar falling through the opening in the floor of the motorcar in such a manner that one end of it came in contact with the axle and the other end with a railroad tie. Defendant produced witnesses who had examined the car immediately after the accident and who testified that the breaks were all fresh and free from rust at the time. This court held that the verdict could not rest on conjecture; that the burden was on plaintiff to show that the accident resulted from defects in the car; and that to sustain a recovery in an action for negligence the evidence must furnish a reasonable basis for concluding that it was more probable that the accident resulted from the negligence alleged than from other causes. In reversing, the court concluded that it appeared more probable that the accident was caused by an angle bar sliding off the shallow box than by defects in the housing of the axle.

It will serve no useful purpose to go on endlessly as to all the details of the conflicting testimony. Suffice it to say that the conflicts here presented questions for the jury to determine, and its verdict cannot be set aside on appeal unless manifestly and palpably contrary to the evidence. Froden v. Ranzenberger, 230 Minn. 366, 41 N. W. (2d) 807. It is apparent that the jury accepted defendant's version of the accident and decided that Bernard's own action in turning the 27,000-pound vehicle without applying the brakes caused it to become lodged in the snowbank rather than the speed of defendant's automobile, as argued by plaintiff. We hold, therefore, that under the facts and circumstances here there is no reversible error either on the ground that the verdict was not justified by the evidence or that is it contrary to law.

■ We come now to plaintiff's claim that the verdict is excessive. The matter of excessive verdicts has been submitted frequently, especially of late, on appeals to this court and sometimes presents perplexing problems. An examination of the record shows that defendant received a concussion of the brain and a comminuted fracture of the right patella, which required an operation and the wir-

ing together of some fragments. He also had 25 to 30 sutures taken in his face and nose and lost part of the cartilage of the nose, resulting in some deformity. It appears from the record that the bursa of the knee was completely destroyed and that a wire remains in his knee, which will remain there permanently unless it becomes infected and causes trouble, in which event an operation for its removal will be necessary. It further appears that he has a 30 percent permanent disability of the right knee and leg, limiting extension, flexion, walking steps, and some bending motions, and that pain will be experienced in the future when pressure is applied to the kneecap area. The verdict amounted to $10,700. His doctor bill was $433, hospital $242.95, automobile damage $1,500, loss of wages $490, or a total of $2,665.95 in special damages. Deducting this from the verdict would leave $8,034.05 for general damages. Plaintiff argues that this is excessive because it appears from the record that defendant returned to work and continued on substantially the same job as he did prior to the happening of the accident. She concedes that it does appear that defendant has had some difficulty with his knee, but it is her claim that the record also shows that he has been able to continue on his job as a mechanic in the greasing department of the Yellow Cab Company and that this indicates clearly that he was able to continue his former work.

While we think that the verdict is liberal, a careful examination of the record satisfies us that under the facts in this case the verdict cannot be held to be so excessive as to justify a reduction by this court. Rather, it appears to us that defendant, aged 39 at the time of the trial, will have some permanent disability in his right knee and that he will probably suffer some pain and inconvenience in the future. It is therefore our opinion that the amount of the verdict must stand.

Affirmed.