## RALPH CARLSON AND ANOTHER v. ALFRED E. PETERSON AND ANOTHER.[1]

December 2, 1955.

No. 36,663.

[1]Reported in 73 N. W. (2d) 367.

*Peterson, Karigan & Schneider,* for appellant.
*Edman & Edman* and *Guy E. McCune,* for respondents.

THOMAS GALLAGHER, JUSTICE.

Action by Ralph Carlson, as an heir of Minnie Amelia Carlson and special administrator of her estate, against Alfred E. Peterson, former administrator of the estate of Charles A. Johnson, deceased father of Minnie Amelia Carlson, and against Eric Blomquist, to impose a constructive trust upon certain farm property purchased by the latter at public auction conducted pursuant to probate court order from the Charles A. Johnson estate for the sum of $20,160, one half of which was subsequently sold by Blomquist to Peterson while the latter was still administrator of the Johnson estate.

It is the contention of plaintiffs that defendants were guilty of fraud and that Peterson's purchase of a one-half interest in the farm while still administrator of the estate was in violation of M. S. A. 525.35 which provides that the representative of an estate:

"* * * shall not purchase any claim against the estate nor shall he purchase directly or indirectly or be interested in the purchase of any property sold by him."

At the close of the testimony the trial court made findings and ordered judgment in favor of defendants holding that there had been a valid sale of the described land to Blomquist on September 14, 1945, for the sum of $20,160; that said sale had been properly reported to and confirmed by the probate court before Peterson had manifested any intention to purchase any interest in the land; and that he had acted "in good faith and without any fraud or fraudulent intent" as had Blomquist.

In addition to the foregoing the court determined that in any event the action was barred by virtue of the limitations in c. 541 and § 525.702. In a memorandum attached to its order, the trial court stated:

"* * * When the Probate Court confirmed the sale * * * Blomquist became the equitable owner of the land. * * * The estate held title to said lands as security for the performance of the contract of sale. After such confirmation of said sale Peterson, as such representative, had no discretionary power in regard to said sale. He was obliged to carry out the terms of the contract for deed. When he purchased one-half interest from Blomquist self-interest did not conflict with his obligations as representative of said estate. His only duty as such representative was to execute the deed, collect the purchase price and account for such purchase price, which he did. He did not purchase the half interest in the land from the estate but he purchased such interest from Blomquist on or about November 1, 1945. Under the evidence, Blomquist purchased the land in good faith and Peterson purchased the one-half interest from Blomquist in good faith.

\* \* \* \* \*

"Neither Peterson nor Blomquist attempted to conceal the transaction. The deed from Blomquist to Peterson was duly placed on record in the office of the register of deeds, of Martin County, Minnesota, on December 13, 1945, as soon as the abstract had been completed. Such record was not constructive notice to the parties interested in said estate but it is evidence of good faith on the part of Peterson and Blomquist and it is evidence that they were not attempting to conceal the transaction."

The facts as disclosed by the record indicate the following: During the course of probate the heirs of the Charles A. Johnson estate suggested to Peterson that the farm be sold and the proceeds of the sale divided amongst the heirs. Peterson thereupon procured from the probate court an order of license to sell the land at public or private sale and thereafter engaged the services of an auctioneer to conduct an auction sale. The latter posted numerous notices of the sale

throughout the county and likewise published advertisements thereof in the Mankato Free Press, the Fairmont Sentinel, and the Triumph Monterey Progress. Prior to the sale the land was appraised at $20,000 by two appraisers appointed by the probate court. These appraisers were the brother and nephew of Peterson, but there is nothing to indicate that they appraised the property at less than its fair market value.

On August 31, 1945, at the auction the highest bid made for the property was $126 per acre which was made by Blomquist. He immediately delivered his check in the sum of $2,500 as a down-payment on his purchase and entered into a contract for deed providing for his payment of the balance in cash as soon as the sale had been reported to and confirmed by the probate court and the necessary instruments of conveyance were ready for delivery.

A few days before November 1, 1945, which had been set for the closing of the transaction, Blomquist called upon Peterson at the Farmers State Bank of Monterey, of which Peterson was president, to inquire about raising money to finance the farm purchase. He was advised by Peterson that the maximum loan which he could expect upon the farm was $10,000. On November 1, 1945, Blomquist again called upon Peterson and suggested that, as a means of aiding Blomquist in connection with the purchase, Peterson purchase from him a one-half interest in the land on the same basis as prevailed at the auction sale. Blomquist testified that he could have consummated the transaction without Peterson's aid but that such a step would have required that he dispose of other assets which he did not wish to sell at that time.

Peterson then agreed to Blomquist's suggestion and thereupon paid to him the sum of $5,080 for a one-half interest in the premises subject to a first mortgage in the sum of $10,000 which had been previously executed by Blomquist and his wife. From such sources and from the additional $5,080 paid by Blomquist, the estate was paid the full amount of the sale price, and Peterson as administrator made, executed, and delivered a warranty deed of the premises to Blomquist, receiving from Blomquist and his wife in turn a warranty deed for a one-half interest therein, the latter deed being

recorded on December 13, 1945. Some years later on February 26, 1949, Peterson purchased from Blomquist the latter's remaining one-half interest in the premises for the sum of $15,500.

Both Peterson and Blomquist testified that prior to the auction sale they had at no time conferred with each other and that the first time Blomquist proposed that Peterson purchase one-half interest in the land was long subsequent to the confirmation of the auction sale by the probate court. Blomquist testified that at the auction he had had no intention of taking in a partner on the transaction; and that his bid of $126 per acre was the highest price bid for the land at that time. With respect to the valuation of the premises, plaintiff submitted the testimony of one real estate man who expressed the opinion that at the time of the sale the premises were worth $140 to $145 per acre; that on a cash sale the farm might bring about $140 per acre. He testified he had in mind bidding the sum of $125 at the auction but did not arrive until subsequent to the sale to Blomquist. The premises were subject to a two-year lease which he agreed lessened the market value of the property.

Mr. Walter Carlson, the auctioneer who conducted the sale, testified that just prior to the sale one of the heirs, Sam Johnson, called upon him with respect to what was designated as a reserve bid; that after Johnson had talked to Mrs. Anna Mathilda Schaefer, another heir in the Johnson estate, he advised Carlson as follows: "If it brings $125 you can sell it. If it doesn't bring that of course we want a chance to talk it over." Carlson testified that in his opinion, based on his experience in conducting similar sales in the vicinity, the reasonable market value of the property was $125 per acre; that it might have brought $10 more or $10 less depending upon many circumstances. He testified that, while he had conferred with Peterson prior to the sale, the latter had left the entire matter to his discretion and had made no suggestions and given no directions in connection therewith.

Testimony was submitted by Mr. Alfred Schmidt, a farmer living near the land in question. In June of 1945 he had purchased a nearby farm for the sum of $135 per acre. During the summer and fall of 1945, he had investigated the land here involved with the idea of

purchasing it and had then formed an opinion that it was not worth more than $125 per acre. He testified that he regarded the farm which he finally purchased as much better than the tract in question.

■ At the outset we are confronted by the trial court's findings to the effect that the auction sale of August 31, 1945, was conducted by defendant Alfred Peterson "in good faith and without any fraud or fraudulent intent" whatsoever; that defendant Blomquist in purchasing the described premises from the estate at the auction sale acted "in good faith and without any fraud or fraudulent intent"; and that such defendants did not conspire with each other or with anyone else to defraud the beneficiaries. There is ample evidence to sustain such findings. It is found in the testimony of the auctioneer relating to his conduct of the sale and to the fact that two of the beneficiaries, Sam Johnson and Mrs. Anna Schaefer, were in attendance and instructed him that a sale at $125 per acre would be satisfactory; by the testimony of plaintiff's witness, Mr. P. C. Reding, that he had intended to bid $125 per acre for the land at the auction sale but arrived too late; as well as in the testimony of defendants to the effect that neither of them had any thought of joining together in the purchase until November 1, 1945, long after the sale had been confirmed by the probate court.

■ Plaintiff urges that the failure of defendant Peterson to promptly deposit the $2,500 check given by Blomquist as a downpayment at the time of the sale, as well as his failure to record his deed from Blomquist until December 13, 1945, are indicative that there was fraud in the transaction. We do not think such factors would compel a finding of fraud as a matter of law. Peterson testified that as president of the Farmers State Bank of Monterey, upon which the Blomquist check was drawn, he knew the check was good and that he held it merely to await confirmation of the sale and the ultimate closing of the transaction. His failure to record the deed from Blomquist to himself was explained to be the result of his decision to await his attorney's opinion with respect to the title and the continuance of the abstract showing the deed to Blomquist and the mortgage. All such evidence was before the trial court and no doubt was weighed and considered by it along with the other

evidence bearing directly on the issue of fraud. As above stated, it would not compel an adverse finding thereon nor necessarily outweigh the evidence upon which the court determined there was no fraud in connection with the conduct of the auction sale. There being ample evidence to support such findings, we of course are bound thereby under well-established principles. Raiche v. Martin, 238 Minn. 230, 56 N. W. (2d) 625; Rivera v. Mandsager, 228 Minn. 227, 36 N. W. (2d) 700; Solosky v. J. A. Johnson Co. 223 Minn. 390, 27 N. W. (2d) 282.

■ The trial court having determined that the auction sale was validly conducted, it would follow that, after its confirmation by the probate court, Blomquist became the equitable owner of the premises entitled to a conveyance thereof by warranty deed upon payment of the balance due thereon. Thereafter, neither the estate nor the beneficiaries therein had any interest in the premises other than to make certain that the terms of the sale were carried out. That this was done is not challenged. It would follow therefrom that when Peterson made his purchase from Blomquist on November 1, 1945, he was not purchasing the property either directly or indirectly from the estate within the limitations or restrictions of § 525.35 and relied upon by plaintiff. It appears well established that in the absence of fraud or collusion purchases of this kind are valid. Ketchum v. Ketchum, 177 Mich. 100, 107, 143 N. W. 25, 27; Wayland v. Crank's Executor, 79 Va. 602; Welch v. McGrath, 59 Iowa 519, 10 N. W. 810, 13 N. W. 638; Staples v. Staples, 65 Va. (24 Grat.) 225; Silverthorn v. McKinster, 12 Pa. 67; Creveling v. Fritts, 34 N. J. Eq. 134; Mason's Dunnell, Minn. Probate Law (2 ed.) § 992; 2 Woerner, American Law of Administration (3 ed.) § 334. As stated in Ketchum v. Ketchum (177 Mich. 107, 143 N. W. 27):

" "* * * the subsequent purchase by an executor of land which he has previously and in good faith sold under license of the probate court is legal. That such purchases are legal is held by Woerner in his work on the American Law of Administration (section 334, p. 702), in which the author says:

" ' "But the rule that an administrator cannot buy indirectly. or acquire the property sold by him as administrator by the interposition of a third party does not extend to a subsequent bona fide purchase by him from one who himself purchased in good faith at the administrator's sale." * * *.' "

Under the principles cited we must hold that Peterson's purchase on November 1, 1945, of an undivided one-half interest in the land sold to Blomquist at the auction sale on August 31, 1945, was not fraudulent nor in conflict with the provisions of § 525.35. It follows that the order of the trial court must be affirmed.

Affirmed.